UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| CHARLOTTE B. SUMRALL D/B/A WELCOME HOST | CIVIL ACTION NO. 15-00061 |
| | JUDGE JOHN W. deGRAVELLES |
| VERSUS | |
| | MAGISTRATE JUDGE STEPHEN |
| RICOH USA, INC. | C. RIEDLINGER |

**RULING AND ORDER**

Before the Court is Defendant's Motion to Dismiss Plaintiff's Complaint (Doc. 2) filed by Ricoh, USA, Inc. Plaintiff opposes the motion. (Doc. 15). This Court has jurisdiction pursuant to 28 U.S.C. § 1332. Oral argument is not necessary.

After carefully considering the law, facts, and arguments of the parties, Defendant's motion is denied.

I.  **Relevant Facts and Procedural Background**

A. **Introduction**

Plaintiff, Charlotte B. Sumrall doing business as Welcome Host ("Sumrall" or "Plaintiff"), brought suit against Defendant Ricoh, USA, Inc. ("Ricoh" or "Defendant") in the 19th Judicial District Court for the Parish of East Baton Rouge alleging Defendant's breach of contract, economic duress, and violation of Louisiana's Unfair Trade Practices and Consumer Protection Law. (Doc. 1-1). Defendant removed this case to this Court, asserting diversity jurisdiction. Ricoh is seeking dismissal of Sumrall's claims for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

1

### B. Plaintiff's Allegations[1]

#### 1. The Terms of the Master Agreement

On November 19, 2010, Sumrall and Ricoh engaged in a Master Maintenance & Sale Agreement ("Master Agreement") which governed the terms and conditions of the relationship between the parties. (Petition for Damages, Doc. 1-1, ¶ 5, p. 1). When Sumrall wished to purchase a copy machine or a service plan from Ricoh, the parties would sign a separate service agreement for that specific transaction. (Master Agreement, Doc. 1-2, p. 1).[2] The parties engaged in Service Order # 1 on the same day, which was for the sale of a copy machine and its maintenance for a 36-month period. (Petition for Damages, Doc. 1-1, ¶ 6, p. 1). Sumrall executed Service Order # 2 on September 29, 2011 for the purchase and maintenance of a second copy machine. (*Id.* at ¶ 8, p. 2). The agreed upon price for service charges was $0.008 per black and white image processed and $0.04 per color image processed. (Petition for Damages, Doc. 1-1, at ¶ 8, p. 2). Under the terms of the Master Agreement, each Service Order would automatically renew for 12 months upon the expiry of their respective 36-month maintenance periods. (Master Agreement, Doc. 1-2, Section 4, p. 2).

#### 2. The 2014 Order Agreement

At approximately the time that the original 36-month period for Service Order #1 had expired in late 2013/early 2014, Ricoh allegedly informed Sumrall that the service charges would increase in price to $0.012 per black and white image processed and $0.055 per color image processed. (Petition for Damages, Doc. 1-1, ¶ 16, p. 3). These represent fee increases of 50% for black and white images and 37.5% for color images. (*Id.* at ¶ 16, p. 3). These new prices were

---

[1] These Facts are assumed to be true for purposes of this 12(b)(6) motion.
[2] The Master Agreement was attached to the Petition. Pursuant to Fed. R. Civ. P. 10(c) the Master Agreement is part of the Petition for all purposes and can be considered for this motion. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000).

referenced in an Order Agreement ("2014 Order Agreement"), despite the fact that Plaintiff alleges that Service Order #1 was still valid under its renewal term and the original 36-month term for Service Order #2 had not yet expired. (*Id.* at ¶ 21, p. 4).

### 3. Allegations of Economic Duress

Due to the high volume of business that Sumrall typically experienced at this time of year and the alleged lack of any potential substitute vendors to help service the machines, she agreed to pay these increased prices on their next two quarterly invoices (March and June 2014) despite being under the impression that Ricoh was violating the terms of the Master Agreement and both Service Orders. (*Id.* at ¶ 14-17, p. 3). Plaintiff alleges that Ricoh "threaten[ed] to withhold services for which [Sumrall] contracted and paid" in order to force Sumrall into agreeing to the higher rates. (Petition for Damages, Doc. 1-1, ¶ 21, p. 4).

**II.     The Dispute**

After paying the second quarterly invoice at the new, higher rate, Sumrall reviewed the terms of the Master Agreement, which governed the terms of all Service Orders between the parties. (*Id.* at ¶ 18, p. 3). The Master Agreement reads, in pertinent part:

> Unless otherwise expressly agreed to in writing, if the term of any Service Order exceeds 12 months, the Periodic Services Charges and the Cost of Additional Images may be increased by [Ricoh] up to 10% annually for each year beyond the initial 12-month period, and [Sumrall] expressly consents to such adjustment without additional notice.

(Master Agreement, Doc. 1-2, Section 5(b), p. 2).

When the next payment became due in September 2014, Sumrall informed Ricoh that all charges in excess of the 10% contemplated by the Master Agreement were an overcharge and, in order to recoup their perceived excess charges from the previous two invoices, Sumrall "readjusted" their own rates to reflect the lower rate on the September invoice. (Petition for

Damages, Doc. 1-1, ¶ 18-19, p. 3-4). Ricoh responded by placing Sumrall on credit hold and canceling all of her further orders for toner. (*Id.* at ¶ 20, p. 4).

### III. Standard for a 12(b)(6) Motion to Dismiss

In *Johnson v. City of Shelby, Miss.*, 135 S.Ct. 346 (2014), the Supreme Court has explained "Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." 135 S.Ct. at 346-47 (citation omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct.1 955, 1965 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009)]; *Twombly*, 555 U.S. at 556. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the

"reasonable inference" the court must make that, with or without discovery, the
facts set forth a plausible claim for relief under a particular theory of law provided
that there is a "reasonable expectation" that "discovery will reveal relevant
evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 555
U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3

(W.D. La. Fe. 9, 2011) (citation omitted).

More recently, in *Thompson v. City of Waco, Tex.*, 764 F.3d 500 (5th Cir. 2014), the Fifth

Circuit summarized the standard for a Rule 12(b)(6) motion for dismissal:

We accept all well-pleaded facts as true and view all facts in the light most
favorable to the plaintiff. . . To survive dismissal, a plaintiff must plead enough
facts to state a claim for relief that is plausible on its face. A claim has facial
plausibility when the plaintiff pleads factual content that allows the court to draw
the reasonable inference that the defendant is liable for the misconduct alleged.
Our task, then, is to determine whether the plaintiff state a legally cognizable
claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502-03 (citations and internal quotations omitted).

### IV. Discussion

#### A. Breach of Contract Claim

##### 1. Parties' Arguments

Sumrall argues that Ricoh violated the Master Agreement as well as the renewed terms of

Service Order # 1. (Opposition to Motion to Dismiss, Doc. 15, p. 4). Sumrall contends that both

the original Service Orders were still in effect at the time that Ricoh increased the charges for

toner resupply and that the increase of fees constitutes a breach of the terms of the parties'

agreements. (*Id.*).

Furthermore, the Master Agreement governs the terms and conditions of every

subsequent agreement in which the parties engage. (*Id.* at 1). By raising the fees for toner

resupply above the 10% which the Master Agreement refers to, Ricoh allegedly violated the

5

contract. (*Id.* at 4). Rather than acceding to the new rates which Ricoh quoted, Plaintiff states that she "yield[ed] under Ricoh's economic pressure" and only acceded to the 2014 Order Agreement under duress. (*Id.*, discussed *infra*).

Sumrall argues that there are three essential elements to a claim for breach of contract:

> First, a plaintiff in a breach of contract claim must prove that the obligor undertook an obligation to perform [. . .] Next, the plaintiff must prove that the obligor failed to perform the obligation, resulting in a breach. Finally, the failure to perform must result in damages to the obligee.

(*Id.* at 4-5; *Sanga v. Perdomo*, No. 14-CA-609, ___ So. 3d ___, 2014 WL 7499383, at *7 (La. App. 5 Cir. Dec. 30, 2014)). She contends that the underlying facts alleged in the Complaint are sufficient to meet these elements. (Doc. 15, p. 5). "Accordingly, [she] has stated a claim for which relief can be granted." (*Id.*). With regard to Ricoh's allegation that Sumrall ratified the 2014 Order agreement by paying the invoices, Sumrall argues that ratification is an issue of fact which ought properly to be argued at trial. (*Id.*).

Ricoh moved to dismiss Sumrall's Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). (Memorandum in Support of Motion to Dismiss, Doc. 2-1, p. 3). The crux of Ricoh's argument is that by enjoying the benefits of the 2014 Order Agreement in the form of goods and services from Ricoh and by acknowledging the existence of this agreement by paying two invoices over a six-month period, Sumrall may not now repudiate the 2014 Order Agreement. (*Id.* at 4).

Ricoh asserts that Plaintiff is barred from alleging breach of contract under the Service Orders because Plaintiff ratified the 2014 Order Agreement by paying two invoices at the increased rates. (*Id.* at 4). Ricoh cites authority to state that "[a] party with full knowledge of all of the facts who accepts the benefit of a contract is deemed to have ratified the contract and is precluded from repudiating the agreement." (*Id.*, quoting *McLemore v. Landry*, 687 F. Supp.

6

1038, 1041 (M.D. La. 1988) *aff'd*, 898 F.2d 996 (5th Cir. 1990)). Defendant stresses the fact that Sumrall "accepted the benefits of Ricoh's services under the 2014 Order Agreement" for two billing periods and that Sumrall did not attempt to repudiate the Agreement until after accepting its terms through confirmation/ratification.[3] (Defendant's Reply to Opposition to Motion to Dismiss, Doc. 18, p. 2-3). Defendant argues that these undisputed facts lead to the conclusion that Sumrall ratified the subsequent 2014 Order Agreement, which was at most a "relatively null" contract due to Plaintiff's alleged lack of consent at the time of the contract's execution. (*Id.* at 2). A relatively null contract can be confirmed pursuant to Louisiana Civil Code Article 2031. (*Id.*). Ricoh maintains that Sumrall's actions represent the confirmation of a relatively null contract and therefore the breach of contract claim must be dismissed. (*Id.* at 3).

### 2. Analysis

The first issue is whether the Plaintiff has stated a claim when she can recover under the Master Agreement despite a subsequently entered, but subordinate, secondary contract that violates the Master Agreement. The Court finds that Plaintiff can recover under these circumstances.

Under Louisiana law, a plaintiff must prove three essential elements in order to prevail on a claim for breach of contract: (1) that the obligor undertook an obligation to perform; (2) that the obligor failed to perform the obligation; and (3) that the failure to perform this obligation resulted in damages to the plaintiff. *Cent. Facilities Operating Co., LLC v. Cinemark USA, Inc.*, 36 F. Supp. 3d 700, 712 (M.D. La. 2014); *Sanga v. Perdomo*, No. 14-CA-609, ___ So. 3d ___, 2014 WL 7499383, at *7 (La. App. 5 Cir. Dec. 30, 2014); *Favrot v. Favrot*, 2010–0986 (La. App. 4 Cir. 02/09/11); 68 So. 3d 1099, 1108-09.

---

[3] Ricoh argues that the terms "confirmation" and "ratification" are interchangeable terms under Louisiana law. (Defendant's Reply to Opposition to Motion to Dismiss, Doc. 18, p. 2-3).

Plaintiff alleges Defendant failed to adhere to the terms of the Master Agreement, specifically to Section 5(b) which contains a limitation of 10% on any increase in Service Order charges. (Doc 15, p. 4; Doc 1-1, ¶9, p. 2 ).

Defendant does not dispute that the 2014 Order Agreement is bound by the terms and conditions of the Master Agreement but characterizes the 2014 Order Agreement as a "new written service order with an uncapped price increase." (Doc. 18, p. 5). Defendant argues that Plaintiff may not sue for breach of contract because Plaintiff ratified the 2014 Order Agreement. (*Id.* at p. 2-3).

*Pacificorp Capital, Inc. v. State Through Div. of Admin., Office of State Purchasing*, involved a challenge to the validity of a contract bid between Delgado Community College and its preferred provider for computer equipment, IBM. 647 So. 2d 1122, 1124 (La. App. 1 Cir. 1994). One of the grounds for the challenge was that the final, accepted contract contained terminology that differed from the Invitation to Bid ("ITB"). *Id.* at 1129. In order to resolve the discrepancy in terms, the court referenced the pertinent language of the Master Agreement, which read in part: "Notwithstanding any other provisions to the contrary in the Master Agreement [. . .] in the event of any conflict between the ITB, the IBM bid response and this contract, the ITB shall prevail, then IBM's bid response, then the contract." *Id.* Though the contract, which incorporated the Master Agreement, was subordinated to the ITB, this was only because the terminology of the Master Agreement required it. Importantly, even when the ITB was allowed to supersede aspects of the contract to provide computer equipment, it was only because the language of the Master Agreement relegated itself to a subordinate role in the event of conflict.

In this case, the Court finds that it must look to the Master Agreement in order to resolve conflicts in the contractual language. In doing so, it is apparent that Ricoh is in violation of the terms of Service Order # 1 per Plaintiff's Complaint. The Master Agreement grants an automatic renewal to the Service Order and has set limitations on the rate increases, which Ricoh has allegedly exceeded. (Master Agreement, Doc. 1-2, Section 4, p. 2; *Id.* at Section 5(b), p. 2).

Even if the Court were to dispense with the *Iqbal* standard of "accepting as true" the factual matter alleged in the complaint and instead, accept Defendant's argument that the 2014 Order Agreement does not violate the limitation on price increases, this still would not justify Ricoh's purported cancellation of the automatic Service Order renewal to which Plaintiff had a right pursuant to Section 4 of the Master Agreement.

Furthermore, Defendant's argument that the parties are entitled to negotiate a "new written service order with an uncapped price increase" is ostensibly reliant on Section 18 of the Master Agreement. (Doc 18, p. 5). However, Section 18 of the Master Agreement deals with Force Majeure and assignations of rights or interests arising thereunder. No section of the Master Agreement appears to authorize unlimited price increases by Ricoh.

Plaintiff has alleged sufficient facts in her complaint to make a plausible claim that Defendant is liable for the contractual breaches alleged. Therefore, Defendant's Motion to Dismiss Plaintiff's breach of contract claim for failure to state a claim is denied.

### B. Claim for Economic Duress and Declaratory Relief

#### 1. Parties' Arguments

Sumrall contends that the fear of economic deprivation is sufficient to meet the level of duress required to vitiate consent under Louisiana law. (Opposition to Motion to Dismiss, Doc. 15, p. 6; *Wolf v. La. State Racing Comm'n*, 545 So. 2d 976, 981 (La. 1989)). "In order to be

actionable, the duress must be of such a nature as to cause a 'reasonable fear' of unjust and considerable injury to a party's property." (Doc. 15 at 6; *Monterrey Ctr., LLC v. Education Partners, Inc.*, 5 So. 3d 225, 230-31 (La. App. 1 Cir. 2008). Furthermore, Sumrall argues that she meets the standard articulated by the U.S. Fifth Circuit case mentioned *supra* in Defendant's Motion. (*Monterrey Ctr., LLC*, 5 So. 3d at 230-31). If the applicable standard for vitiating consent is a threat sufficient to cause reasonable fear for a party's property, then Plaintiff argues that, *a fortiori*, Defendant's actual withholding of services to Plaintiff constituted duress sufficient to vitiate consent. (*Id.*). Therefore, Plaintiff moves the court for declaratory judgment on the 2014 Order Agreement, declaring it invalid due to Plaintiff's lack of consent. (*Id.*).

Because Sumrall allegedly cannot prove economic duress, Ricoh argues that the Court should dismiss Plaintiff's claim for declaratory judgment stating that the 2014 Order Agreement is null and void for lack of consent. (Doc. 2-1, p. 5-6). Ricoh argues that Plaintiff has incorrectly stated the standard for the level of duress required to vitiate consent. (Defendant's Reply to Opposition to Motion to Dismiss, Doc. 18, p. 4). Ricoh states that the present case is factually distinguishable from *Wolf v. La. State Racing Comm'n*, 545 So. 2d 976, 976 (La. 1989), *supra*, because in that case the plaintiff "protested prior to entering into the agreement and only finally executed the agreement in question after a clause was added indicating that they were signing under protest." (*Id.*; quoting *Wolf*, 545 So. 2d at 976).

Ricoh alleges that a party may successfully argue duress vitiating consent if that party has been induced by threats to such an extent that there are *no reasonable alternatives to consent*. (Doc. 18 at 5; *Wolf*, 545 So. 2d at 980) (emphasis added). Ricoh argues that there cannot have been "no reasonable alternatives" because Sumrall had the financial wherewithal to pay the two invoices at increased rates and ceased future payments only because Sumrall felt "excused from

10

such payment." (Doc. 18 at 5-6). Therefore, Ricoh argues that Sumrall has failed to make a claim for duress vitiating consent and the claim for declaratory judgment should be dismissed. (*Id.* at 6).

**2. Analysis**

The Court finds that Plaintiff has sufficiently alleged economic duress such that her consent to the 2014 Order Agreement was vitiated and therefore denies Defendant's motion on this issue. Article 1959 of the Louisiana Civil Code stipulates that "[c]onsent is vitiated when it has been obtained by duress of such a nature as to cause fear of unjust and considerable injury to a person's property, person, or reputation." The personal circumstances of a party must be taken into account when evaluating the reasonableness of that party's fear.

Sumrall cites *Wolf v. La. State Racing Comm'n*, *supra*, in support of its argument that fear of economic deprivation is sufficient to vitiate consent for duress. But not every court interprets Article 1959 of the Civil Code in this way. In *Wolf*, the dispute arose between racing jockeys and the Fair Grounds. 545 So. 2d 976, 976-77 (La. 1989). In order to race, jockeys were forced to waive their rights to sue in tort for injuries sustained while racing in exchange for a worker's compensation agreement. *Id.* The jockeys signed these contracts under protest and immediately sought to have these contracts reviewed by the Louisiana State Racing Commission and then by a state court. *Id.* at 977.

The Louisiana Supreme Court held that the contract was invalid due to the Fair Grounds' superior bargaining strength and the fear of economic deprivation that the jockeys would suffer from an inability to practice their profession if they did not agree to sign the contract. *Id.* Sumrall argues that this case supports the proposition that "[t]he fear of economic deprivation is sufficient to meet the level of duress required to vitiate consent." (Doc. 15 at p. 6).

11

However, other courts have been more reluctant to find mere economic pressures sufficient to establish duress. For example, in *Pellerin Const., Inc. v. Witco Corp.*, the court found that a party who signed a contract modification to its economic detriment while in financial straits does not suffer economic duress sufficient to vitiate consent. 169 F. Supp. 2d 568, 579-80 (E.D. La. 2001). There, a construction company sued a manufacturer of specialty chemicals to escape a series of contract modifications which the plaintiff signed to its financial detriment. *Id.* at 576.

Among the factors considered by the court in determining there was sufficient economic duress to vitiate the contract were (1) whether the defendant improperly threatened the plaintiff; (2) whether the defendant had purposely delayed the construction project so that it could make unreasonable demands of the plaintiff; and (3) whether the defendant withheld payments to the plaintiff during contract negotiations in order to extract more favorable business concessions. *Id.* at 580. The court concluded that evidence failed to show that the defendant had "engage[d] in conduct designed to produce [financial] stress." *Id.* at 579. "While there is undoubtedly some relationship between [Plaintiff's] financial condition and the project delays, defendants did not engage in conduct designed to produce [Plaintiff's] economic problems, and the mere stress of [Plaintiff's] business conditions does not constitute economic duress." *Id.* at 580.

It is sometimes necessary for a court to engage in a fact-intensive inquiry in order to determine whether a contract is void for economic duress. In *Advocate Fin., LLC v. Cardenas*, is court considered a case involving a financial services company and the terms of a loan repayment contract with a law firm. No. 09-1023, 2012 WL 370189, at *1 (M.D. La. 2012) *aff'd*, 502 Fed. App'x. 384 (5th Cir. 2012). There, Mr. Cardenas financed his litigation practice with a line of credit from Advocate Financial which reached into the hundreds of thousands of dollars.

*Id.* Between the years 2003 and 2009, Cardenas was forced to renegotiate the terms of his line of credit because he habitually did not make any payments on his outstanding interest as required. *Id.* Advocate Financial filed suit against Cardenas seeking a money judgment as well as formal recognition of its security interest in the assets Cardenas had offered as collateral. *Id.* at *2. In his defense, Cardenas claimed that he was economically coerced into signing each subsequent loan agreement, each of which contained more onerous terms, so that he could maintain the "lifeline and bloodline" of his business. *Id.* Cardenas argued he did not legally consent to these loan agreements because of the coercion of financial duress. *Id.*

    The court applied a test similar to that used in *Pellerin* to determine whether Cardenas was under the requisite level of duress. It concluded that (1) the threat of a lawful activity did not constitute duress, although making a threat that is only lawful in appearance might constitute duress; and (2) "neither financial strait nor the mere stress of business conditions constitute economic duress if the opposing party did not engage in conduct designed to produce that stress." *Id.* at *4. *See also Key Bank Nat'l Ass'n v. Perkins Rowe Assocs., LLC*, No. 09-497-JJB-SCR, 2011 WL 3444301, at *4 (M.D. La. 2011 Aug. 8, 2011) *aff'd*, 539 Fed. App'x. 414 (5th Cir. 2013) ("[t]hough Defendants may have felt compelled to sign the Amendment in order to keep the project economically viable, Plaintiff played no role in causing the project to go over-budget"); *Comeaux v, Entergy Corp.*, 734 So. 2d 105, 107 (La. App. 5 Cir. 1999) ("Louisiana appellate courts have held that financial strait does not constitute duress"); *Shepherd v. Allstate Ins. Co.*, 562 So. 2d 1099, 1101 (La. App. 4 Cir. 1990) (holding that a car accident victim who signed a compromise with defendant insurance company mere hours after the accident was not under economic duress despite "need[ing] money immediately").

Ricoh contends that its alleged threats to withhold maintenance and toner resupply services from Sumrall does not equate to economic duress because they were not "of such character as to destroy the free agency of the party to whom the threat was directed." (Memorandum in Support of Motion to Dismiss, Doc. 2-1, p. 5; quoting *Palmer Barge Line, Inc. v. S. Petrol. Trading Co.*, 776 F.2d 502, 505 (5th Cir. 1985)). It argues that threatening to break a contract is, by itself, insufficient to constitute economic duress. (*Id.*; *Hartsville Oil Mill v. United States*, 271 U.S. 43, 49 (1926)).

While the bar to successfully assert economic duress to the extent that it vitiates a party's consent is a high one, Sumrall's Complaint alleges sufficient facts to clear the bar. Ricoh's threat to withhold goods and services from the copy machines unless Sumrall acceded to the 2014 Order Agreement, under the circumstances existing at the time, resembles the situation which existed in *Wolf*, *supra*: (1) Sumrall's economic viability depended on a working commercial contract with a service provider for Sumrall's copy machines; (2) Sumrall was not the cause of her own financial distress; and (3) it was Defendant's conduct that created the fear of economic duress.

For these reasons, Defendant's Motion to Dismiss Plaintiff's claim for economic duress is denied because Plaintiff's allegations are facially plausible and, if true, entitle her to relief.

### C. Claim under LUTPA for Unfair Trade Practices

Ricoh argues that Louisiana's Unfair Trade Practices and Consumer Protection Law ("LUTPA"; La. R.S. 51:1401 *et seq.*) does not provide a cause of action for commercial contracts – rather, it only allows for suits by direct consumers or business competitors. (Doc. 2-1, p. 6). Because Sumrall is neither, Ricoh argues that Plaintiff has failed to state a claim for which relief can be granted. (*Id.* at 7).

However, the cases relied on by Ricoh have been overruled by *Cheramie Services, Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So. 3d 1053, which expanded the pool of potential suitors under LUTPA beyond merely consumers or competitors. (Doc. 15 at 7). "Although business consumers and competitors are included in the group afforded in this right of action, they are not its exclusive members. Contrary holdings are hereby repudiated, because any limitation must be contained in the language of the statute." (*Id.*; quoting *Cheramie*, 35 So. 3d at 1057-58). *Cheramie* has been followed by this and other federal courts in Louisiana. *Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, No. 13-4904, 2015 WL 631244, at *8 (E.D. La. Feb. 12, 2015) (applying the *Cheramie* standard to a contractual dispute between an artist and a conservation group); *Burgers v. Bickford*, No. 12-2009, 2014 WL 4186757, at *3 (E.D. La. Aug. 22, 2014) ("In light of *Cheramie,* the Court finds that Plaintiff has standing to bring his LUTPA claims"); *Felder's Collision Parts, Inc. v. General Motors Co.*, 960 F. Supp. 2d 617, 638 (M.D. La. 2013) ("The Supreme Court of Louisiana recently held that this right of action extends to **all persons**, including business competitors, who assert loss of money or property as a result of another's unfair or deceptive trade practices") (emphasis added).

In addition, Ricoh argues that LUTPA does not protect against the kind of conduct Plaintiff claims Ricoh engaged in. The "range of prohibited practices under LUTPA is extremely narrow." *Cheramie*, 35 So. 3d at 1060. Specifically, LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La-R.S. 51:1405. Louisiana courts have ruled inconsistently as to whether breach of contract is actionable under LUTPA. Some courts have held that a mere breach of contract claim is not actionable under this statute. *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993) ("There is a great deal of daylight between a breach of contract claim and the egregious behavior

the statute proscribes"); *Schenck v. Living-Centers East, Inc.*, 917 F. Supp. 432, 439 (E.D. La. 1996) ("Mere breach of contract is not actionable under . . . LUTPA").

However, other courts have held that breach of contract claims are not automatically excluded from LUTPA. In *State ex rel. Guste v. Orkin Exterminating Co., Inc.*, the State of Louisiana filed suit under LUTPA against Orkin for unilaterally raising its rates in violation of a contract which fixed those rates. 528 So. 2d 198, 199 (La. App. 5 Cir. 1988); *writ denied,* 533 So. 2d 18 (La. 1988). In contracting with thousands of Louisiana consumers to provide pest control services, one of the inducements used by Orkin was the promise to charge the same renewal fee every year without any increase in the amount charged for as long as the covered structure remained standing. *Id.* In violation of the contract, Orkin began to increase its renewal fees. *Id.* Orkin argued that breach of contract is insufficient to merit a suit under LUTPA because the behavior proscribed by LUTPA must be of a more nefarious nature. *Id.* at 202. The court, quoting an investigatory report compiled by the Federal Trade Commission, characterized Orkin's conduct as "a widespread, systematic program implemented by Orkin to effect *a unilateral modification of its own standard contract terms* agreed to by many thousands of consumers." *Id.* (emphasis added). While the misconduct at issue in *Orkin* was much more widespread than the misconduct alleged in the present case, the underlying conduct was similar. *See also*, *Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, No. 13-4904, 2015 WL 631244, at *8 (E.D. La. Feb. 12, 2015) (plaintiff could sue for defendant's breach of commercial contract with "unfair or deceptive acts").

Furthermore, Sumrall is not alleging a simple breach of contract in the present case, but also Defendant's use of economic duress and threats to Sumrall's business in order to coerce

16

Sumrall to execute the 2014 Order Agreement. (Plaintiff's Complaint, Doc. 1-1, ¶ 26-27, p. 5).

Thus, Plaintiff has alleged a plausible violation of LUTPA, and Defendant's motion is denied.

V.   Conclusion

Accordingly,

**IT IS ORDERED** that Ricoh, USA Inc.'s Motion to Dismiss Plaintiff's Complaint (Doc. 2) is hereby **DENIED**.

Signed in Baton Rouge, Louisiana, on August 4, 2015.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**